## Richmond

Edward Legum v. Howard Hugh Harris, State Highway Commissioner.

March 9, 1964.

Record No. 5697.

Present, All the Justices.

*Louis B. Fine* (*Howard I. Legum; Fine, Fine, Legum, Schwan & Fine*, on brief), for the plaintiff in error.

*Paul D. Stotts, Assistant Attorney General* (*Robert Y. Button, Attorney General; M. Ray Johnston, Assistant Attorney General*, on brief), for the defendant in error.

BUCHANAN, J., delivered the opinion of the court.

Edward Legum, appellant, filed in the court below his petition for a writ of mandamus to compel the State Highway Commissioner, appellee, to institute and conduct condemnation proceedings to ascertain the damages to his building, alleged to have been caused by the con-

struction of an underpass at the intersection of Tidewater Drive and Little Creek Road, in the city of Norfolk.

The petition alleged that in constructing the underpass the appellee's contractor excavated deep holes close to appellant's property and as a result the walls and other parts of his building cracked and were otherwise damaged. It also alleged that appellant had demanded of the appellee that he institute condemnation proceedings but appellee had failed to do so.

Appellee's demurrer to the petition was overruled and he filed an answer in which he denied that he or his agents excavated deep holes close to the appellee's property, or did anything by which appellant's property, which he alleged was more than 250 feet from any right of way of the Highway Department, could have been damaged.

The court below heard the appellant's evidence *ore tenus* and at its conclusion struck it out and dismissed appellant's petition for mandamus on the ground that his evidence was too indefinite to prove the cause of any damage that appellant's building may have suffered.

The first story of appellant's building, approximately 90 x 165 feet, was erected in 1953, and a second story was added in 1955 or 1956. The evidence indicates that it was built of cinder blocks and stuccoed, and the architect testified that it was erected under his supervision in accordance with the plans and specifications in a substantial, workmanlike manner. However, in reply to questions by the court, he testified that with those plans in front of him an ordinarily prudent man would put down borings to determine what was beneath the surface and that was not done in this case.

This architect testified that there were no cracks in the building at the time it was completed but since then he had observed some cracks on the southwest corner, the east side and at the northwest of the building. He was asked his opinion as to whether there was connection between the cracks and the underpass work and replied, "There is a possibility they could be caused by pumping operations which, in turn, cause settlement." The court asked him what caused the cracks and he replied that he did not think he could answer the question; that he just had an opinion. He then continued:

"Now, what caused the settlement, that I cannot prove. If the pumping operations have caused the settlement under the buildings and so on, it is possible they caused that. I do not think it is the pile driving because it is too far away, in my opinion, but I think that pumping operation could have something to do with that."

A structural engineer testified that he examined the building in

1958 and found numerous cracks which varied from minor cracks, to be expected from temperature changes or shrinkage of the material, to others more serious, "and definitely caused by a settlement." He said that his opinion at the time was that "were there any settlement," it was due to the excavation for the underpass, that any deep excavation in this area required pumping out of the ground water, and "It is probable in my opinion, that some fine materials were carried out of the area by this well pointing and caused a general settlement of the entire area there." He was asked to explain how the moving of water from underground some 240 feet away would cause erratic settling of the building as he had described, and he replied that he did not know, "It could be that the ground is not uniform. It has varying characteristics."

He stated: "In my opinion, a strong probability exists that the work for the underpass could well result in this damage that I saw to the Legum building." However, he said that he had no knowledge "one way or the other of the underpass," and saw the construction of it only to the extent of driving by. He said that the cracks in the Legum building were "a little bit abnormal for uniform settlement," and the only way he could explain it was to point to the work at the underpass "as a probability." He could not say how much water would have to be removed to cause the condition in the Legum building, but he said it would be possible to construct the underpass without the damage to the building which he had described, "There are several probabilities which could occur, one of which you would have no damage, of course."

A witness, formerly employed as a salesman by appellant, testified that the building cracked from the pile driving at the underpass. He first observed cracks in a couple of places, he said, and it gradually got worse, but he did not know how long it was before he saw any more. He said also that there was a continuous pumping operation going on.

Another witness testified that there were two or three pumping operations going on continuously, the exact location of which he did not recall. The pump station was perhaps 200 feet or less from Legum's building. It required the digging of a hole the depth of which he thought was between 28 and 34 feet, he did not recall exactly. He said that during the excavation one of the water mains burst and dumped something like 1.5 million gallons of water in the underpass, which had to be pumped out eventually.

The appellant testified that the cracks in his building became noticeable after the contractor started his work, and he made a claim to the Highway Commissioner about it; that the contractor had two or three deep well pumps which were operated continuously through the whole job. He was asked on cross-examination whether he rememberd a Mr. Armistead coming to his building in October 1957 and asking him when he first observed the cracks and whether he stated on that occasion that he was unable to state when the cracks first appeared, but that he noticed them before the construction of the underpass started. His reply was, "I don't remember this moment making that statement. I can't tell you I did or did not."

The general contractor who built the original building in 1953 described the location of the cracks in the building and was asked his opinion as to what caused them. He replied that he assumed they were not there before the underpass was started, that in other cases he had known about where there was considerable pumping "the water carries a little silt with it and lets the ground down," and he did not know what else could have caused the cracks in the Legum building. He stated, however, that he did not know the pattern that water would take when it was moved, and he would have to assume that it would be taken from under this building before it would cause a settling and "If no water was taken out from underneath it, I don't think you would have any settlement." He did not know, he said, that the damage to the building was caused by lowering the water table, and that it was purely an assumption that such was the cause of the damage.

On an *ore tenus* hearing the finding of the trial court "upon the credibility of the witnesses and the weight to be given their testimony stands on the same footing as the verdict of a jury and should not be disturbed on appeal unless plainly wrong or without evidence to support it." *Ware* v. *Ware*, 203 Va. 189, 195, 123 S. E. 2d 357, 361; *Barnes* v. *Quarries, Inc.*, 204 Va. 414, 420, 132 S.E.2d 395, 399.

The writ of mandamus should be issued only where there is a clear and specific legal right to be enforced or a duty which ought to be and can be performed, and it is never granted in doubtful cases. *Gilliam* v. *Harris*, 203 Va. 316, 318, 124 S.E.2d 188, 189; *Dovel* v. *Bertram*, 184 Va. 19, 22, 34 S.E.2d 369, 370; *May* v. *Whitlow*, 201 Va. 533, 537, 111 S.E.2d 804, 805.

"It is essential to the issuance of a writ of mandamus that the legal right of the plaintiff or the relator to the performance of the particular act, sought to be compelled, be clear, specific, and complete." 55

C.J.S., Mandamus, § 53, p. 88. *Lehman* v. *Morrissett,* 162 Va. 463, 469, 174 S.E. 867, 870; *Richmond-Greyhound Lines* v. *Davis,* 200 Va. 147, 151-2, 104 S.E.2d 813, 816.

*Hicks* v. *Anderson,* 182 Va. 195, 28 S.E.2d 629, relied on by appellant, was an original petition in this court and the writ was awarded because the evidence was sufficient to show clearly that the petitioner had sustained damages. Neither that case nor the West Virginia cases of *Puritan Coal Corp.* v. *Davis,* 130 W.Va. 20, 42 S.E.2d 807, and *State, etc.* v. *White Oak Ry. Co.,* 65 W.Va. 15, 64 S.E. 630, cited by the appellant, are in conflict with the principles above stated.

Before the writ could properly be issued in this case the burden was on the appellant to prove that he had suffered damage which had been caused by the acts of the appellee. Evidence which leaves the cause of damage to surmise or conjecture is not sufficient. It is incumbent on the plaintiff who seeks compensation for damage to his property from building a road, as on the plaintiff who seeks damages for negligence, to show who and what caused the damage, and if that is left to conjecture, guess or random judgment, he cannot recover. *Cf. Weddle, Adm'x* v. *Draper,* 204 Va. 319, 322, 130 S.E.2d 462, 465. *Cloutier, Adm'r* v. *Gas Corp.,* 202 Va. 646, 652, 119 S.E.2d 234, 238.

Here the appellant's theory is that in the construction of the underpass water was pumped from his property which caused his building to settle and the cracks in his walls to result. No description of the pumping operation other than that it was continuous is given. The evidence does not show when it began or when it ended. The only evidence as to volume of the water pumped was from one witness who related his estimate to a burst main. Nobody testified that the pumping carried away any silt or sand or even any water from the appellant's property, situated, as the court could have found, some 240 feet away. As conceded by the general contractor who erected the building, and as indicated in the testimony of the other witnesses, set forth above, it is "purely an assumption" that the construction of the underpass caused the damage of which the appellant complains.

We agree with the trial court that the evidence offered by the appellant did not show that the damage to his building was caused by the acts of the appellee, and that it was too indefinite to require the latter to institute condemnation proceedings to ascertain the amount of such damage.

The writ of mandamus was properly refused and the judgment below is

*Affirmed.*